DECISION *Page 2 
{¶ 1} This is a disheartening case. A boy is slapped in the face by an adult. The boy's older brother, 15-year-old defendant-appellant Jari Tiller, retrieves a gun and runs after the perpetrator. When he approaches the house of the perpetrator, a crowd of people, including young children, are outside in the street. He fires the gun once in the air. Although he cannot find the person who slapped his brother, he then points the gun and fires at two other people, both of whom are trying to protect the children. Thankfully he misses both victims. He was convicted of two counts of felonious assault, with gun specifications, and sentenced to 15 years' incarceration.
 {¶ 2} Tiller now appeals, arguing that the trial court erred by (1) failing to conduct a hearing to determine whether a child witness was legally competent to testify; (2) excluding evidence of a police report offered by the defense; (3) entering a conviction when the evidence was insufficient and weighed against the convictions; and (4) improperly imposing consecutive sentences.
 I. A Shooting {¶ 3} On September 23, 2005, Tina Head was sitting outside her house at 2171 St. Michael Street in the Price Hill neighborhood of Cincinnati, overseeing several children as they played. Right after her son Aaron and two of his friends returned to her house, two young males came around the corner of Neave Street and St. Michael and approached Head's house. One of the young males pulled a revolver out of the front of his shorts and fired a shot into the air. *Page 3 
 {¶ 4} Head testified that she was fearful for the children playing in the street, so she rushed out into the street to draw the young man's attention. She begged the young man not to shoot, but the second young man kept saying, "[S]hoot the mother fuckers, J.R., shoot the mother fuckers." The young male holding the gun then turned the gun on Head and fired. The bullet went over Head's head.
 {¶ 5} As this occurred, Glen Wilson, whose nephew, Levi, was outside playing at the time, rushed out of his parents' house. The young man turned and shot the gun a third time at Wilson, missing as Wilson dove back into the entryway of the house. The two young men then turned and ran back around the corner of Neave and St. Michael.
 {¶ 6} A crowd formed after the shooting, and some members followed the two young men as they entered 2176 Storrs Street. When Cincinnati police officers arrived on the scene, they learned that the gun had been thrown in the shared basement of this two-family residence. The police found a .38-caliber revolver in the basement, and they also found Jari Tiller and another boy in the residence. Tiller was identified as the shooter by a number of the witnesses and was arrested.
 {¶ 7} At a jury trial, Tiller was found guilty of two counts of felonious assault,[1] as well as one-year and three-year gun specifications. He was sentenced to six years' incarceration for each felonious assault, to run consecutively. The gun specifications were merged for sentencing purposes, adding three years. Tiller's total sentence was 15 years' incarceration. *Page 4 
 II. Child Testimony {¶ 8} In his first assignment of error, Tiller argues that the trial court erred by failing to conduct a hearing to determine whether Levi Wilson, an eight-year-old child, was competent to testify. The state correctly points out that Tiller never objected to Levi's testimony.
 {¶ 9} Evid.R. 601 sets out the general rule of competency for all witnesses: "Every person is competent to be a witness except: (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."
 {¶ 10} The Ohio Supreme Court has interpreted this rule to mean that children under the age of ten are presumptively incompetent to testify.[2] The presumption is rebuttable. Proper judicial procedure requires the trial court to conduct a voir dire examination of a child under ten to determine the child's competency.[3]
 {¶ 11} The Ohio Supreme Court has established a test for determining competency.[4] When determining whether a child under ten is competent to testify, the trial court must take into consideration the child's ability to (1) receive accurate impressions of fact, (2) recollect those impressions or observations, (3) communicate what was observed, (4) understand truth and falsity, and (5) appreciate the responsibility to tell the truth. Once a trial court concludes that the threshold requirements have been satisfied, a witness under the age of ten is deemed competent to testify.[5] *Page 5 
 {¶ 12} A trial court is required to make a preliminary determination as to the competency of all witnesses, including children.[6]
Normally, this is by simple observation that requires no specific inquiry. Absent an abuse of discretion, competency determinations of the trial court will not be disturbed on appeal.[7] "The trial judge, who saw the children and heard their testimony and passed on their competency, was in a far better position to judge their competency than is this court, which only reads their testimony from the record."[8]
And an abuse of discretion connotes an attitude by the trial court that is unreasonable, unconscionable, or arbitrary.[9] Unreasonable means that no sound reasoning supports the decision.[10]
 {¶ 13} In the present case, Tiller correctly notes that the trial court failed to voir dire Levi before allowing him to testify. But Tiller did not object to Levi's testifying without a competency determination. Thus, the issue is whether the failure of the trial court to voir dire Levi to determine his competency rises to the level of plain error.[11] Plain error exists only if, but for the error, the outcome of the trial would have clearly been different.[12]
 {¶ 14} Although the trial court failed to voir dire Levi and determine his competency, the state asked Levi a number of questions before beginning its examination.
 {¶ 15} "Q: Levi, do you know the difference between the truth and a lie? *Page 6 
 {¶ 16} "A: Yes.
 {¶ 17} "Q: Is it important to tell the truth?
 {¶ 18} "A: Yes.
 {¶ 19} "Q: Do bad things happen if you tell a lie?
 {¶ 20} "A: Yes.
 {¶ 21} "Q: Do you promise to tell the truth here?
 {¶ 22} "A: Yes.
 {¶ 23} "Q: Okay, so if I told you that I was wearing a clown suit, is that the truth or a lie?
 {¶ 24} "A: Lie.
 {¶ 25} "Q: Okay. But what if I told you I was wearing a white shirt, is that the truth or a lie?"
 {¶ 26} "A: Truth."
 {¶ 27} And before Tiller's counsel began his cross-examination, he asked Levi questions about where he went to school, what his address was, how many siblings he had, and other general matters. Satisfied with Levi's answers, Tiller's counsel proceeded with cross-examination. Levi correctly answered questions about where he attended school, which grade level he was in, how many siblings he had, and the importance of telling the truth.
 {¶ 28} While it is better judicial practice for the trial court to voir dire child witnesses under the age of ten, there appears on the record indicia that Levi could receive just impressions of facts and relate those facts truthfully, and that he understood the importance of telling the truth.[13] Both counsel asked questions and *Page 7 
were evidently satisfied that Levi was competent. Any error by the trial court was de minimus.
 {¶ 29} And in this case there were four other witnesses besides Levi who identified Tiller as the shooter. Thus, we hold that the trial court's failure to voir dire Levi did not cause prejudice to Tiller and was not plain error. We overrule Tiller's first assignment of error.
 III. Evidentiary Matters — Police Reports {¶ 30} In his second assignment of error, Tiller claims that the trial court erred by excluding from evidence a police report that he offered. Tiller intended to use the police report's narrative section to demonstrate that eyewitnesses had given varying descriptions of the perpetrator.
 {¶ 31} Under Evid.R. 803(8)(b), "matters observed pursuant to a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by [the] defendant," are not excluded by the hearsay rule.
 {¶ 32} We hold that Cincinnati Police Officer John Isaiah Brown's police report should have been admitted into evidence by the trial court. Under Evid.R. 803(8)(b), though the report described matters observed by a police officer, it was nevertheless admissible because it was offered by the defendant, and because there were no indications that the report lacked trustworthiness. But under Evid.R. 103(A), an error regarding the admission or exclusion of this type of evidence is not reversible error "unless a substantial right of the party is affected[.]" Here, no such right was affected. Many of the witnesses gave slightly different accounts of what Tiller was wearing — some *Page 8 
thought he was wearing blue jeans, others thought he was wearing long blue-jean shorts. Most of the witnesses believed he was wearing a white shirt, but Frederick Krueger believed he was wearing a white and red striped shirt. Despite the small inconsistencies in the accounts of the shooter's dress, five witnesses testified that Tiller was the shooter.
 {¶ 33} We hold that the trial court's failure to admit the police report did not affect Tiller's substantial rights. The second assignment of error is overruled.
 IV. Sufficiency and Weight of the Evidence {¶ 34} In his third assignment of error, Tiller argues that there was insufficient evidence to convict him, and that his convictions were against the manifest weight of the evidence. In doing so, Tiller claims that (1) there was no credible corroborating evidence that he was the shooter because the gunshot-residue test was not positive; (2) the eyewitnesses failed to provide any physical characteristics of the shooter except that he was a young African-American male with a white shirt and blue jeans; and (3) he demonstrated through Tesa Thompson the alibi that he was in her apartment during the shootings.
 {¶ 35} When reviewing the sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the state. We must then determine whether that evidence could have convinced any rational trier of fact that the essential elements of the crime had been proved beyond a reasonable doubt.[14]
 {¶ 36} A review of the weight of the evidence puts the appellate court in the role of a "thirteenth juror."[15] We must review the entire record, weigh the evidence, consider *Page 9 
the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[16] A new trial should be granted only in exceptional cases where the evidence weighs heavily against the conviction.[17]
 {¶ 37} Tiller was found guilty on two counts of felonious assault. The felonious-assault statute prohibits a person from "knowingly causing or attempting to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance. "[18]
 {¶ 38} The state offered the testimony of Tina Head, Glen Wilson, Frederick Krueger, Justin Rainey, Levi Wilson, Roy Gentry, and Harold Wilson, as well as Cincinnati Police Officers Michael Roetting and John Cordova.
 {¶ 39} Tina Head testified that she was sitting outside her house and watching several children as they played when two young African-American males came around the corner of Neave Street and St. Michael and approached Head's house. She stated that one of the young males pulled a revolver out of the front of his shorts and fired a shot into the air. Head testified that because she was fearful for the children playing in the street, she had rushed out into the street to draw the young man's attention. She had begged the young man not to shoot, but he turned the gun and fired a shot that went right over her head. She then stated that when Glen Wilson rushed out of his parents' house across the street, the young man turned and fired a shot at him before turning around and running back around the corner. Head identified Tiller as the shooter at trial.
 {¶ 40} Glen Wilson testified that he had just got out of the shower and was getting dressed when he heard Head scream, "Please don't shoot." He looked out the *Page 10 
window and saw two young African-American males out in the street, and he then saw his nephew, Levi, hiding behind a garbage can. Wilson ran out of the house, but as he exited, the man with gun had turned the gun at Wilson. Wilson dove back into the house as a shot was fired. Wilson identified the type of gun used, but was not able to identify the shooter.
 {¶ 41} Frederick Krueger lived between where the shooting occurred on St. Michael Street and where the shooters came from. He testified that he saw a young African-American male slapped hard in the face by a white male adult, and then saw the same young African-American male come back minutes later with another young African-American male. He stated that the second man was holding a revolver and asking, "Where's he at?" Krueger ran to get his children out of the street. He heard three gunshots, and then the two young African-American males came running back past his house. Krueger identified Tiller as the male holding the gun.
 {¶ 42} Justin Rainey and Levi Wilson, both children, testified that they saw Tiller fire his gun at Head and Wilson. Harold Wilson, Glen's father, also identified Tiller as the male who fired the gun.
 {¶ 43} Tiller called Michael Trippe, a trace-evidence examiner at the Hamilton County Coroner's Office, to state that the gunshot-residue test on Tiller was negative. Tiller also called Tesa Thompson, who testified that Tiller was playing video games in her apartment at 2136 Storrs Street. But on cross-examination, Thompson admitted that she had not moved into the apartment until November 15, 2005, six weeks after the shootings. Needless to say, the jury did not believe Thompson's story.
 {¶ 44} Tiller's arguments are without merit. Five witnesses identified Tiller as the shooter. The police showed up within minutes of the incident, and *Page 11 
eyewitnesses were able to point to the apartment building in which the shooter threw the gun. The gun was retrieved and Tiller was arrested. The fact that some eyewitnesses thought Tiller had on blue jeans as opposed to blue-jean shorts did not negate the identifications. Furthermore, the lack of gunshot residue did not exclude Tiller as the shooter, as his own witness, Trippe, testified that gunshot residue was often not detected when shooters washed their hands, changed their clothes, or rubbed their hands on something.
 {¶ 45} We conclude that a rational factfinder, viewing the evidence in a light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Tiller had committed the offense of felonious assault. Therefore, the evidence presented was legally sufficient to sustain Tiller's convictions.
 {¶ 46} While Tiller claims that this was a case of misidentification, our review of the record does not persuade us that the jury clearly lost its way and created a manifest miscarriage of justice in finding Tiller guilty of felonious assault. Therefore, the convictions were not against the manifest weight of the evidence.
 {¶ 47} Accordingly, we overrule Tiller's third assignment of error.
 V. Consecutive Sentences {¶ 48} In Tiller's fourth and final assignment of error, he challenges the trial court's imposition of consecutive sentences. He maintains that the sentences violated his rights to a jury trial and due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and Sections 5 and 16, Article I, of the Ohio Constitution, because the sentences were made consecutive based on facts not determined by a jury or proved beyond a reasonable doubt. Tiller *Page 12 
also contends that the Ohio Supreme Court's decision in State v.Foster,[19] which held that the imposition of consecutive sentences based on judicial factfinding is unconstitutional, retroactively modifies a defendant's sentence in violation of the Ex Post Facto Clause of the United States Constitution.
 {¶ 49} In Foster, the Ohio Supreme Court noted that "R.C.2929.14(E)(4) and 2929.19(B)(2)(c) require trial courts that impose consecutive sentences to make the statutorily enumerated findings and to give reasons at the sentencing hearing to support those findings for review on appeal."[20] But because the "total punishment increases through consecutive sentences only after judicial findings beyond those determined by the jury or stipulated to by the defendant, R.C.2929.14(E)(4) violates principles announced in Blakely"[21] and is therefore unconstitutional.
 {¶ 50} The court's remedy was to sever R.C. 2929.14(E)(4) as unconstitutional and to keep the remaining unaffected provisions of the sentencing statutes. After the severance, judicial factfinding is not required before a trial court imposes consecutive prison terms. Trial courts now have full discretion to impose a prison sentence within the statutory range and are no longer required to provide reasons for imposing a sentence involving consecutive prison terms.[22]
 {¶ 51} As we have previously held that the Ohio Supreme Court's decision in Foster does not violate ex post facto and due process principles,[23] the trial court was within its discretion to impose prison sentences within the statutory range and to impose consecutive prison terms without making any factual findings. Here, Tiller was convicted of felonious assault, a second-degree felony that carries a prison-term *Page 13 
range of two to eight years' incarceration. Tiller was sentenced to six years' incarceration for each felonious assault, within the statutory range.
 {¶ 52} Thus, we overrule Tiller's fourth assignment of error and affirm the trial court's judgment.
Judgment affirmed.
HILDEBRANDT and SUNDERMANN, JJ., concur.
[1] R.C. 2903.11(A)(2).
[2] See State v. Wallace (1988), 37 Ohio St.3d 87, 94, 524 N.E.2d 466; see, also, State v. Wilson (1952), 156 Ohio St. 525, 529-530,103 N.E.2d 552.
[3] Wilson, 156 Ohio St. at 529, 103 N.E.2d 552.
[4] See State v. Frazier (1991), 61 Ohio St.3d 247, 574 N.E.2d 483, syllabus.
[5] Id.
[6] See Wilson, 156 Ohio St. at 529.
[7] See Frazier, 61 Ohio St.3d at 251, 574 N.E.2d 483; see, also,State v. Boston (1989), 46 Ohio St.3d 108, 115, 545 N.E.2d 1220.
[8] See State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, quoting Barnett v. State (1922), 104 Ohio St. 298, 301,135 N.E. 647.
[9] See Franklin City Sheriff's Dept. v. State Emp. Relations Bd.
(1992), 63 Ohio St.3d 498, 506, 589 N.E.2d 24.
[10] See AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597;State v. Echols (1998), 128 Ohio App.3d 677, 669-670,716 N.E.2d 728.
[11] Crim.R. 52(B).
[12] See State v. Moreland (1990), 50 Ohio St.3d 58, 62,552 N.E.2d 894.
[13] See State v. Morgan (1986), 31 Ohio App.3d 152, 157,509 N.E.2d 428.
[14] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[15] See State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[16] Id., citing Tibbs v. Florida (1982), 457 U.S. 31, 42,102 S.Ct. 2211.
[17] Id.
[18] R.C. 2903.11(A)(2).
[19] See State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470.
[20] Id. at ¶ 66, citing State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165, 793 N.E.2d 473.
[21] Id. at ¶ 67.
[22] Id. at ¶ 100.
[23] See State v. Bruce, 1st Dist. No. C-060456, 2007-Ohio-175. *Page 1